
FILED
CHARLOTTE, NC

APR 27 2011

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:11CR122 |
| | ) | |
| v. | ) | 31 U.S.C. § 5318(h) |
| | ) | 31 U.S.C. § 5322 |
| **COMMUNITYONE BANK, N.A.** | ) | |
| | ) | |

## BILL OF INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

At the specified times and at all relevant times:

### Entities

1. Defendant CommunityONE Bank, N.A. (the "Bank") was a financial institution based in Asheboro, North Carolina with 45 offices throughout North Carolina. The Bank was wholly owned by FNB United Corporation, a publically traded holding company. The Bank was subject to oversight and regulation by the Department of the Treasury, Office of the Comptroller of the Currency ("OCC").

2. Keith Franklin Simmons was a Bank customer who used various accounts with the Bank to operate a $40,000,000 Ponzi securities fraud and money laundering scheme. Simmons is now a resident of Mecklenburg County Jail in Charlotte, North Carolina in the custody of the United States Marshal.

### Bank Secrecy Act

3. The Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 et seq., and its implementing regulations require domestic banks, insured banks, and other financial institutions to establish, implement, and maintain programs designed to detect and report suspicious activity indicative of money laundering and other financial crimes.

4. Title 12, Code of Federal Regulations, Section 21.11 requires that a bank file a Suspicious Activity Report ("SAR") when it detects known or suspected money laundering activity or a federal crime.

5. Title 12, Code of Federal Regulations, Section 21.21 requires that a bank implement and maintain a program to detect known or suspected money laundering activity or federal crimes.

## The Violation

6. For over two and one-half years -- from April 2007 through December 2009 -- Simmons ran a Ponzi scheme using primarily one account with the Bank.

7. Indeed, from April 23, 2007 until September 10, 2009, Simmons deposited with the Bank a total of $35,071,773 of investor funds into account *12534 and withdrew from the Bank over the same time span $35,071,883 from the same account.

   A. The Bank received the approximate $35,000,000 in deposited funds from individual investors and hedge funds investing individual investors' money with Simmons. These investor funds were received by the Bank via wire transfer from the individual investor (such as from the investor's retirement account) or the investor's hedge fund. For example, hundreds of investor fund transfers to the Bank reflected that they were from IRAs.

   B. The Bank wired back approximately half of the $35,000,000 to the same investors and hedge funds during the same time period. These withdrawals were used by Simmons to further his scheme.

   C. Simmons operated in the small town of West Jefferson, North Carolina. It was well-known in that community that Simmons was supposedly investing in the foreign currency exchange market.

   D. The Bank's records clearly showed that Simmons invested no money in any foreign currency exchange, nor in any other such investment vehicle. The only transfers resembling investments of any kind were approximately $4,600,000 (or 13% of deposits) that Simmons used to buy real estate for cash, including a wide swath of land around the address Simmons provided to the Bank as his personal residence.

   E. The Bank's records also showed, among other things, that Simmons diverted (i) over $2,000,000 to other accounts with the Bank that Simmons controlled to operate Simmons' other businesses, (ii) nearly $800,000 in cash withdrawals, gift cards, and transfers to his personal account with the Bank; and (iii) numerous payments to support his luxurious lifestyle including payments for private jets, vehicles, and gifts.

8. The Bank did not file any SARs on Simmons or any of his accounts during this time period, despite the hundreds of suspicious transactions that took place within one of Simmons' accounts over those two and one-half years, and despite the Bank's computer software repeatedly flagging Simmons' account activity as potentially suspicious.

9. During the same time period, other banks shut down the accounts for the hedge fund managers sending money to Simmons. Yet during the same time period, the Bank did not file any SARs on Simmons or any of his accounts.

2

Case 3:11-cr-00122-RJC   Document 1   Filed 04/28/11   Page 2 of 3

# COUNT 1
## Failure to Maintain Anti-Money Laundering Program
### (31 U.S.C. §§ 5318, 5322)

From in or about April 2007, and continuing until in or about December 2009, in the Western District of North Carolina, and elsewhere, the defendant,

**COMMUNITYONE BANK, N.A.**

did willfully fail to establish an anti-money laundering program, including, at a minimum, (a) the development of internal policies, procedures, and controls designed to guard against money laundering; (b) the designation of a compliance officer to coordinate and monitor day-to-day compliance with the Bank Secrecy Act and anti-money laundering requirements; (c) the establishment of an ongoing employee training program; and (d) the implementation of independent testing for compliance conducted by bank personnel or an outside party.

In violation of Title 31, United States Code, Sections 5318(h)(1) and 5322(a).


ANNE M. TOMPKINS
UNITED STATES ATTORNEY

*/s/ Kurt W. Meyers*
KURT W. MEYERS
ASSISTANT UNITED STATES ATTORNEY

*For /s/ Kurt W. Meyers*
MARK T. ODULIO
ASSISTANT UNITED STATES ATTORNEY


JENNIFER SHASKY CALVERY
CHIEF, ASSET FORFEITURE AND MONEY LAUNDERING SECTION
U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION

*/s/*
MICHAEL G. MOSIER
TRIAL ATTORNEY