UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:11CR122 |
|---|---|---|
| | ) | |
| v. | ) | 31 U.S.C. § 5318(h) |
| | ) | 31 U.S.C. § 5322 |
| **COMMUNITYONE BANK, N.A.** | ) | |
| | ) | |

### DEFERRED PROSECUTION AGREEMENT

Defendant COMMUNITYONE BANK, N.A. (the "Bank"), by and through its undersigned attorney, pursuant to authority granted by its Board of Directors, and the United States Attorney's Office for the Western District of North Carolina and the Asset Forfeiture and Money Laundering Section of the Criminal Division of the United States Department of Justice (collectively, the "United States") enter into this Deferred Prosecution Agreement (the "Agreement"). This Agreement shall be in effect for a period of twenty-four (24) months.

1. The Bank accepts and acknowledges that the United States will file a criminal information (the "Information") in the United States District Court for the Western District of North Carolina charging the Bank with the offense relating to failing to maintain an effective anti-money laundering program, in violation of Title 31, United States Code, Sections 5318(h)(1) and 5322(a). In doing so, the Bank knowingly and willingly waives its right to indictment on this charge.

2. The Bank accepts and acknowledges responsibility for its conduct as set forth in the Information attached hereto and incorporated by reference herein as Appendix A.

3. This Agreement reflects and recognizes the following:

A. The Bank has experienced over $283 million in losses over the past two years and is on the verge of failure.

    1. As of December 31, 2010, the Bank was considered "significantly undercapitalized," under applicable federal law, and was operating pursuant to an order issued by its primary federal regulator, the Office of the Comptroller of the Currency ("OCC") requiring it to, among other things, raise capital or sell or merge with a third party.

    2. The Bank's tangible capital dropped below 2% as reported in its call report as of March 31, 2011, resulting in the Bank being considered "critically undercapitalized" under applicable federal law. As a result, absent a sale, merger or recapitalization, the OCC, subject to certain exceptions, was required by law to close the Bank within 90 days of being notified of such status, and to place the Bank into receivership with the Federal Deposit Insurance Corporation ("FDIC") acting as receiver.

    3. The Bank is valued at approximately $2,500,000 under the capitalization and merger deal discussed below. However, the Bank's holding company, FNB United Corp., has negative net worth, and the Nasdaq stock Market has given notice to the holding company that its stock is subject to being delisted because it stockholders' equity is less than $2,500,000 as of December 31, 2010.

B. If the Bank is placed into receivership, the FDIC will bear the cost of resolution in an approximate amount of $500,000,000 in loss to the Deposit Insurance Fund, and negative collateral consequences to hundreds of employees

2

not involved in the Bank's BSA/AML program, its shareholders and the communities it serves, and no funds would be available for distribution to the victims identified in *United States v. Simmons*, Case No. 3:10CR23-C.

C. The Bank will be recapitalized in a transaction that will include the installation of a new management team and a new board of directors who will enhance the Bank's anti-money laundering operations.

1. Two large outside anchor investors have agreed to recapitalize the Bank by purchasing approximately $77.5 million each in common stock in the Bank's holding company, subject to a number of conditions, including a successful capital raise by FNB United of at least $310 million in total (or at least $155 million in addition to the $155 million agreed to be placed by the anchor investors).

2. As part of the capital raise, a new management team will be put in place at FNB United and the Bank, consisting of well-qualified former executives from either First Union or Bank of America, who have committed to enhance the Bank's operations, including its BSA/AML program.

3. As part of the capital raise, a new board of directors will also be appointed at FNB United and the Bank to oversee the Bank's activities, which board would include outside qualified individuals with previous financial institution experience and will be committed to overseeing the implementation of enhanced anti-money laundering systems, internal controls and operations.

D. The Bank is committed to continue to cooperate with the United States in its ongoing investigation.

4. Should the United States initiate the prosecution deferred by this Agreement, the Bank agrees that it will neither contest nor contradict the facts set forth in the criminal information filed in conjunction with this Agreement and that the Information shall be admitted against the Bank in any such proceeding as an admission, without objection. Neither this Agreement nor the Information is a final adjudication of the matters addressed in such documents.

5. The Bank expressly agrees that it shall not, through its present or future attorneys, board of directors, officers, or any other person authorized to speak for the company, make any public statement, in litigation or otherwise, contradicting the Bank's acceptance of responsibility set forth above or the factual allegations in the criminal information filed in conjunction with this Agreement, except insofar as the Bank contests the applicability of the factual allegations in the criminal information and/or this Agreement to a specific civil litigant or class of litigants. Any such contradictory statement shall constitute a breach of this Agreement and the Bank thereafter would be subject to prosecution. The decision of whether any public statement by any such person contradicting a fact contained in the criminal information will be imputed to the Bank for the purpose of determining whether the Bank has breached this Agreement shall be at the sole discretion of the United States. Should the United States decide that a public statement by any such person contradicts in whole or in part a statement of fact contained in the criminal information, the United States shall notify the Bank. The Bank may avoid a breach of this Agreement by publicly repudiating such statement within two business days after receipt of such notification. Consistent with the Bank's obligations as set forth above, the Bank shall be

permitted to contest liability, raise defenses, or assert affirmative claims in civil proceedings with specific civil litigants or classes of litigants relating to the matters set forth in the criminal information, including by disputing that the factual allegations in the criminal information and/or this Agreement apply to a specific civil litigant or class of litigants. This paragraph is not intended to apply to any statement made by any individual employed by the Bank in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Bank.

6. The Bank agrees to continue to cooperate fully with the United States, and with any other agency designated by the United States, in its ongoing investigation. The Bank agrees that its cooperation shall include, but shall not be limited to, the following:

A. Complete and truthful disclosure of all non-privileged information as may be requested by the United States with respect to the activities of the Bank and its subsidiaries and affiliates, and its present and former officers, agents, and employees, concerning all matters inquired into by the United States.

B. On request from the United States, assembling, organizing, and producing (in any method and format requested by the United States) any and all non-privileged relevant document, records, electronic data, or other tangible evidence in the Bank's possession, custody, or control concerning all matters inquired into by the United States. Whenever such data is in electronic format, the Bank shall provide access to such data and assistance in operating computer and other equipment as necessary to retrieve the data. This obligation shall not include production of materials covered by the attorney-client privilege or the work product doctrine. In addition, the Bank shall in all material aspects completely, fully and timely comply with all the record keeping and reporting

5

requirements imposed upon it by the Bank Secrecy Act, 31 U.S.C. §§ 5311 through 5332 and the Bank Secrecy Act implementing regulations.

C. Using the Bank's best efforts to facilitate the availability of its present and former executives and employees to provide information and/or testimony as requested by the United States, including but not limited to sworn testimony in any proceeding and interviews with law enforcement authorities as requested.

D. Providing testimony and other information deemed necessary by the United States or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents in any proceeding.

E. Cooperation will include identification of witnesses who, to the Bank's knowledge, may have material information regarding the matters under investigation. With respect to any information, testimony, document, record, or other tangible evidence provided to the United States pursuant to this Agreement, the Bank consents to any and all disclosures to other government agencies of such materials as the United States, in its sole discretion, deems appropriate.

7. The Bank agrees to implement remedial measures designed to comply fully with the Bank Secrecy Act, and abide by any orders and regulations of the OCC and other relevant bank regulators. In particular, the Bank agrees to implement fully the recommendations and all other measures required to address the BSA/AML concerns in the OCC's Report of Examination dated September 30, 2010. The Bank will continue to strengthen its BSA/AML program to support a finding that no material deficiencies exist therein based upon an OCC or other reliable examination or BSA compliance review of the Bank, which must occur no farther than six (6) months prior to the termination date of the Agreement, otherwise the Agreement will be

automatically extended until the soonest examination or other reliable report can be reviewed. A determination of the materiality of any deficiencies, including, e.g., whether they are imminently addressable so as not to preclude termination of the Agreement, shall be at the discretion of the United States.

8. The Bank must provide to the United States certification by its head of compliance within six (6) months from execution of this Agreement that he or she (1) has reviewed the commitments contained in this Agreement; (2) has made inquiries with relevant Bank personnel, including the responsible heads of internal audit and operations; and (3) based on those inquiries, can attest that the Bank has complied or has taken substantial steps to fully comply with the commitments contained in this Agreement. The Bank's head of compliance, or other principal with authority to bind the Bank, must provide to the United States each six (6) months of the term of the Agreement a certification that the Bank is operating according to the best practices of BSA/AML compliance and, if not, what steps are being taken to reach best practices, including reporting what has been done during the preceding period to implement and strengthen BSA/AML program and what steps are planned for the subsequent period to continue to improve the program. Finally, during the term of the Agreement, the Bank shall timely use its best efforts to obtain the appropriate authorization and, assuming that authorization is granted, provide to the United States all reports on the Bank conducted by its relevant regulators within two (2) weeks of them being provided to the Bank.

9. Given the unique circumstances of this case, some of which are set out in this Agreement and the Information, the Bank agrees to pay a total of $400,000 on the day of the merger and recapitalization to the Clerk of Court for the U.S. District Court in the Western District of North Carolina to administer restitution payments to the over 400 victims identified in

*United States v. Simmons*, Case No. 3:10CR23-C, on a pro rata basis proportionate to their losses from the Ponzi scheme.

10. All payments made pursuant to this Agreement are final and shall not be refunded under any circumstance, including if the United States later determines that the Bank has breached this Agreement and brings a prosecution against it. Further, nothing in this Agreement shall be deemed an agreement by the United States that this amount is the maximum criminal fine that may be imposed in such prosecution, and the United States shall not be precluded from arguing that the Court should impose a higher fine in the event of a breach. The United States agrees, however, to recommend to the Court that the amount paid pursuant to this Agreement should be offset against whatever fine the Court shall impose as part of its judgment in the event of a subsequent breach and prosecution.

11. The United States agrees that if the Bank is in full compliance with all of its obligations under this Agreement, the United States, within thirty (30) days of the expiration of this Agreement, will seek dismissal with prejudice of the criminal information filed against the Bank and this Agreement shall expire. The thirty-day dismissal period may be extended for up to sixty (60) additional days at the reasonable discretion of the United States in order to complete (e.g., whether awaiting final audit reports of the bank, reviewing recently received reports, or other reason) the determination that the obligations under this Agreement have been met by the Bank. The United States may request further additional time with leave of the court.

12. Should the United States determine that the Bank through an employee of the Bank, acting on behalf of the Bank and with the knowledge of the Bank management (i.e., a Division President or above), has knowingly and intentionally committed any federal crime after date of this Agreement, the Bank shall, in the sole discretion of the United States, thereafter be

subject to prosecution for any federal crimes, including those arising from the conduct underlying this Agreement.

13. Should the United States determine that the Bank has deliberately given false, incomplete, or misleading information pursuant to this Agreement, or has otherwise knowingly, intentionally, and materially violated any provision of this Agreement, the Bank thereafter shall be subject to prosecution for any Federal criminal violation, including those arising from the conduct underlying this Agreement.

14. The Bank agrees that the decision whether conduct and/or statements of any individual will be imputed to the Bank for the purpose of determining whether the Bank has knowingly, intentionally and materially violated any provision of this Agreement shall be in the sole discretion of the United States.

15. Should the United States determine that the Bank has committed a knowing, intentional, and material breach of any provision of this Agreement, the United States shall provide written notice to the Bank, addressed to its counsel, James W. Cooper, Esq., Arnold & Porter LLP, 555 Twelfth Street, NW, Washington, DC 20004-1206, with a copy to the Bank, Attention: R. Larry Campbell, 150 South Fayetteville St., Asheboro, NC 27203, or to any successor that the Bank may designate, of the alleged breach and provide the Bank with a two-week period from the date of receipt of such notice in which to make a presentation to the United States, or its designee, to demonstrate that no breach has occurred, or, to the extent applicable, that the breach was not knowing, intentional or material, or has been cured. Upon request by the Bank, the United States may agree in writing to extend this two-week period, including providing the Bank with an opportunity to cure any breach of this Agreement. The parties to this Agreement expressly understand and agree that should the Bank fail to make a presentation to

the United States, or its designee, within the two-week period (or other period agreed to by the United States), the United States may conclusively presume that the Bank is in knowing, intentional and material breach of this Agreement. The parties further understand and agree that the exercise of discretion by the United States or its designee under this paragraph is not subject to review in any court or tribunal.

16. It is further agreed that in the event that the United States, in its sole discretion, determines that the Bank has materially breached or violated any provision of this Agreement:

(a) all statements made by or on behalf of the Bank to the United States, or any testimony given by the Bank before a grand jury or any tribunal, at any legislative hearings, or to the Commodities Futures Trading Commission or U.S. Securities and Exchange Commission, whether prior or subsequent to this Agreement, or any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the United States against the Bank; and

(b) the Bank shall not assert any claim under the United States Constitution, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of the Bank prior to or subsequent to this Agreement, or any leads therefrom, should be suppressed.

17. The Bank expressly waives all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Western District of North Carolina. The Bank further waives any right to contest any prosecution of the Bank relating to the conduct that is the subject of or related to the criminal information on the ground that such prosecution is time-barred by the applicable statute

of limitations. The Bank's waiver of the statute of limitations is knowing and voluntary and in express reliance on the advice of counsel.

18. The Bank hereby further expressly agrees that any violations of the Bank Secrecy Act pursuant to 31 U.S.C. §§ 5318(h) and 5322(a) that were not time-barred by the applicable statute of limitations as of the date of this Agreement may, in the sole reasonable discretion of the United States, be charged against the Bank within six (6) months of any breach of this Agreement notwithstanding the expiration of any applicable statute of limitations.

19. The Bank acknowledges that the United States has made no representations, assurances, or promises concerning what sentence may be imposed by the Court should the Bank materially breach this Agreement and this matter proceed to judgment. The Bank further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

20. This Agreement and all provisions set forth herein bind the Bank and any of its branches, representative offices, successors, and assigns. The Bank agrees that in the event it sells all or a significant portion of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a stock or asset sale, merger into another company, consolidation, or other form of business combination, or otherwise undergoes a direct or indirect change of control within the term of this Agreement, it shall include in any such contract a provision providing that the obligations described in this Agreement shall bind the purchaser/successor of such assets, if an asset sale, the Bank, if a stock sale, and the surviving company in the event of a merger or other form of consolidation or business combination.

21. It is further understood that this Agreement is binding on the Bank and the United States, as defined in paragraph 1, but specifically does not bind any other federal agencies, or

any state or local authorities, although the United States will bring the cooperation of the Bank and its compliance with its other obligations under this Agreement to the attention of state or local prosecuting offices or regulatory agencies, if requested by the Bank or its attorneys.

22. It is further understood that this Agreement does not relate to or cover any conduct by the Bank other than the conduct within the scope of, and connected to the accounts and criminal activity described in, the Information that was filed with this case.

23. The Bank and the United States understand that the Agreement to defer prosecution of the Bank must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve a deferred prosecution for any reason, both the United States and Bank are released from any obligation imposed upon them by this Agreement and this Agreement shall be null and void.

24. This Agreement sets forth all the terms of the Deferred Prosecution Agreement between the Bank and the United States. This Agreement shall be executed by the parties hereto immediately prior to and as a condition to the closing of the recapitalization and shall become effective upon the closing of that transaction. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the United States, the Bank's attorneys, and a duly authorized representative of the Bank.

**On Behalf of the United States:**

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

*/s/ Kurt W. Meyers*
KURT W. MEYERS
ASSISTANT UNITED STATES ATTORNEY

*/s/ Kurt W. Meyers*
FOR MARK T. ODULIO
ASSISTANT UNITED STATES ATTORNEY

JENNIFER SHASKY CALVERY
CHIEF, ASSET FORFEITURE AND MONEY LAUNDERING SECTION
U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION

_____
MICHAEL G. MOSIER
TRIAL ATTORNEY

# DIRECTOR'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for COMMUNITYONE BANK, N.A. ("the Bank"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Bank, to each of the terms. Before signing this Agreement, I consulted with the attorney for the Bank. The attorney fully advised me of the Bank's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Bank, in any way to enter into this Agreement. I am also satisfied with the attorney's representation in this matter. I certify that I am a director of the Bank, and that I have been duly authorized by the Bank to execute this Deferred Prosecution Agreement on behalf of the Bank.

4-26-11
DATE

James M. Campbell, Jr
Chairman of the Board
COMMUNITYONE BANK, N.A.

## CERTIFICATE OF COUNSEL

I am counsel for COMMUNITYONE BANK, N.A. ("the Bank"). In connection with such representation, I have examined relevant the Bank documents, and have discussed this Agreement with the authorized representative of the Bank. Based on my review of the foregoing materials and discussions, I am of the opinion that:

1. James M. Campbell, Jr. is duly authorized to enter into this Agreement on behalf of the Bank.

2. This Agreement has been duly and validly authorized, executed and delivered on behalf of the Bank, and is a valid and binding obligation of the Bank.

Further, I have carefully reviewed every part of this Agreement with directors of the Bank. I have fully advised these directors of the Bank's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. To my knowledge, the Bank's decision to enter into this Agreement is an informed and voluntary one.

____4/26/11____  
DATE

____James W. Cooper / JWH____  
JAMES W. COOPER, ESQ.  
ARNOLD & PORTER LLP  
Attorney for COMMUNITYONE BANK, N.A.